UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION


UNITED STATES OF AMERICA,    )
    )
    Plaintiff,    )
    )
    vs.    )    Case No. 1:05CR 143 RWS
    )
JORGE LOPEZ-VARGAS,    )
    )
    Defendant.    )


## REPORT AND RECOMMENDATION

This matter is before the court on the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b). The defendant filed his Motion to Suppress Evidence and Statements (Document #13). The government filed Government's Response to Defendant's Motion to Suppress Evidence (Document #16). An evidentiary hearing was held. The defendant filed a post-hearing Memorandum in Support of Defendant's Motion to Suppress (Document #23), and the government filed its Reply to Defendant's Memorandum (Document #24).

The court has found the parties' memoranda helpful in narrowing the issues and providing factual and case law support for the positions of the parties.

## Factual Background

A confidential informant (CI) for the Bootheel Drug Task Force, described by a task force agent as "reliable," purchased methamphetamine on October 17th, 2005, from a person later identified as Defendant Jorge Lopez-Vargas. The sale took place while Lopez-Vargas and the CI

were in a black Ford Focus automobile bearing Missouri registration 254-XYM. This purchase occurred while the defendant was parked in the Focus outside Lopez-Vargas's residence. At the time of the buy, the CI observed Lopez-Vargas in possession of a large amount of "ice" methamphetamine, which the source estimated to be at least two ounces, and a set of digital scales. Lopez-Vargas had used the scales to weigh out the methamphetamine that the CI purchased.

Later on the evening of the 17th, the CI made arrangements with the defendant to purchase additional methamphetamine. A meeting was set up at a parking lot in Steele, Missouri. Officers observed the black Ford Focus automobile in which Lopez-Vargas had conducted the earlier drug transaction arrive at the buy site. Task Force Agent Tom Trowbridge, listening to a transmitting device, was able to "fairly clearly" hear a conversation between a person he recognized as the CI and a male person whom he believed to be the target, Mr. Lopez-Vargas. Agent Trowbridge, by training and experience a narcotics investigator, believed the conversation he was hearing was a drug transaction and that it was "going well."

After the Focus drove away, Agent Billy Joe Stanfield, Jr., was told by the CI that the seller had been alone and that the CI had exchanged the buy money for methamphetamine, which the CI then gave to Agent Stanfield. The CI indicated that the seller had pre-packaged the methamphetamine and that she had not seen any additional quantities of methamphetamine this time, as she had earlier in the day.

Officers following Lopez-Vargas briefly lost track of the Focus when it turned into the driveway of a residence approximately one-half mile from the location of the second buy. Officers were aware that Lopez-Vargas did not live at this residence, but believed that an associate of his, one Joe Ben Baxter, did. After locating the Focus, officers conducted surveillance, and

approximately one to one and a half hours later the vehicle was observed by officers conducting surveillance leaving the residence where it had been located.

Upon the Focus's coming out of the home's driveway, Agent Trowbridge left his position and approached the Focus head on in order to confirm that it was the suspect vehicle. Agent Trowbridge was fairly certain it was the suspect vehicle but decided to turn around to get behind the vehicle in order to confirm the license plate number. While he was following the Ford Focus, Trowbridge observed it cross the centerline and drive in the middle of the road for some distance. After seeing the license plate and confirming that it was, in fact, the Ford Focus used in the earlier distributions, Agent Trowbridge turned on his lights and stopped the car.

When the Focus stopped, the defendant stuck both his hands outside of the vehicle through the driver's side window and held them there while Agent Trowbridge approached. Agent Trowbridge came to the conclusion that Lopez-Vargas had prior experience in dealing with the police, perhaps on a high risk felony traffic stop.

According to Agent Trowbridge, Mr. Lopez-Vargas was very polite and compliant and spoke with the officers in the English language using understandable full sentences. As the defendant answered the officer's questions and complied with the requests made to him in English, the officers believed that he had a good comprehension of the English language. Lopez-Vargas never asked for an interpreter, nor complained that he could not understand the officers.

According to his testimony, Trowbridge asked Lopez-Vargas if he had any drugs or weapons in the vehicle and was told no. Trowbridge then asked Lopez-Vargas if officers could search the vehicle and Lopez-Vargas replied "Yes, you can" and made an open gesture with his hands that the officers believed also indicated his consent to the search. Prior to Trowbridge's asking for consent to search the vehicle, according to Trowbridge's testimony, Lopez-Vargas had

not been searched, placed under arrest or handcuffed. Officers did not surround the defendant, were not conspicuously armed and made no display of force toward the defendant. Mr. Lopez-Vargas was not physically restrained by the officers, was not threatened nor was any type of intimidation employed by the officers. Again, according to Agent Trowbridge, no promises or representations were made to obtain Lopez-Vargas's consent to search and at no time during the search did Lopez-Vargas object to the search, withdraw his consent to search or limit his consent. The stop was conducted along a public roadway. Approximately three minutes elapsed between the stop and Lopez-Vargas's giving consent. Lopez-Vargas showed no signs of being incapacitated by drugs or alcohol. Upon searching the vehicle, agents found digital scales in the glove compartment. They also found a compartment located behind the glove box in the dash board of the Ford Focus. Within that compartment were located a 9 mm handgun, approximately ten ounces of methamphetamine and a large amount of United States currency.

After the contraband was found in the secret compartment, Lopez-Vargas was advised that he was under arrest and was handcuffed. Lopez-Vargas was then read his Miranda rights by Agent Stanfield and was asked if he understood those rights. Lopez-Vargas replied "Yes." Agent Trowbridge asked Lopez-Vargas if the methamphetamine was his and Lopez-Vargas replied that it belonged to his friend who lives in Memphis.

Once at the Pemiscot County Jail, Lopez-Vargas was searched by jail staff prior to being incarcerated and officers located additional bags of suspected controlled substances in his underwear. Also located on Lopez-Vargas's person was an additional $1,260.00 in United States currency. Included among that currency was approximately $180.00 used as "buy money" in the earlier transactions.

Task Force Agents Stanfield and Fowler spoke to Lopez-Vargas at the county jail in the office of the chief jailer. The defendant was not handcuffed. Prior to doing so, the officers advised him of his <u>Miranda</u> rights for the second time. Agent Stanfield read the <u>Miranda</u> rights from a preprinted form. Lopez-Vargas indicated that he understood his rights and agreed to speak with the officers. Lopez-Vargas also signed both the notice of rights and written waiver of rights portion of the form. Stanfield's testimony was that no promises, threats or representations were made by the officers to obtain the defendant's waiver and at no point did Lopez-Vargas attempt to invoke his right to remain silent or request counsel. Lopez-Vargas conversed in the English language with the officers and never requested an interpreter. Lopez-Vargas implicated himself and others in trafficking methamphetamine and offered to work a deal with authorities if they could get him out of jail.

On October 18, 2005, at approximately 12:30 P.M., Special Agent Bernard Gard of the Drug Enforcement Administration, spoke with Lopez-Vargas, again at the Pemiscot County Jail. Lopez-Vargas indicated to Gard that he both understood and read the English language. The interview was conducted in a conference-type room at the Sheriff's Department. After Agent Gard identified himself, Lopez-Vargas immediately asked Agent Gard to make a deal with him. Lopez-Vargas was then advised of his <u>Miranda</u> rights for a third time and indicated again that he understood them. Agent Gard went over a <u>Miranda</u> waiver form in detail with Lopez-Vargas by reading each right and then explaining it further. Gard stopped after each right to ask Lopez-Vargas if he understood each right. After each right, Lopez-Vargas indicated that he did, in fact, understand each right. Lopez-Vargas then looked over the waiver form and signed each portion of the form. Agent Gard testified that no threats, promises or representations were made to

encourage Lopez-Vargas to give up his rights, and at no time during the subsequent interview did Lopez-Vargas invoke his right to counsel, stop answering questions or request an interpreter.

After waiving his rights, Lopez-Vargas asked Agent Gard how he could "get out of this situation" and agreed to cooperate. Lopez-Vargas told Gard that he had been hired to translate drug transactions because he could speak both English and Spanish. Lopez-Vargas then discussed drug trafficking and made some phone calls in an effort to help himself out.

## **Discussion**

## **The Stop**

In his Motion to Suppress Evidence and Statements (Document #13) and in his Memorandum in Support of Defendant's Motion to Suppress (Document #23) filed after the evidentiary hearing, Defendant Jorge Lopez-Vargas maintains that the members of the Bootheel Drug Task Force stopped the Ford Focus automobile driven by the defendant without an arrest or search warrant and without other lawful authority. The government, both in its Response to Defendant's Motion to Suppress Evidence (Document #16) and in its Reply to Defendant's Memorandum in Support of Motion to Suppress Evidence (Document #24), urges that the stop was based upon a reasonable suspicion that an offense had occurred as set out in Terry v. Ohio, 392 U.S. 1 (1968).

An investigative stop is permitted under the Fourth Amendment when a law enforcement officer is able to point to specific and articulable facts which, taken with rational inferences from these facts, create a reasonable suspicion that the person has or is about to commit a crime. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968). United States v. Thompkins, 998 F.2d 629, 633 (8th Cir. 1993; United States v. Hughes, 15 F.3d 798, 801 (8th Cir. 1994); United States v. Yang, 345 F.3d 650, 656 (8th Cir. 2003). Reasonable suspicion is a "less demanding standard than probable

cause and requires a showing considerably less than preponderance of the evidence." Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673 (2000).

Information possessed by members of the Bootheel Drug Task Force before the stop of the defendant's automobile included information from various sources. A confidential informant (CI) of the Bootheel Drug Task Force told officers that on October 17, 2005, the CI had purchased methamphetamine from a person later identified as the defendant while the defendant and the CI were in a black Ford Focus automobile with a Missouri registration of 254-XYM. During this transaction, the CI stated that the CI had observed a large amount of additional methamphetamine in the Ford Focus automobile at the time of the first buy on October 17, 2005. This information was given to Bootheel Drug Task Force officers, including Agent Billy Stanfield, who relayed the information to Agent Tim Trowbridge. The first buy on October 17th, a controlled buy, was witnessed by other members of the Drug Task Force (Tr. 7) Officer Trowbridge was not present during the first buy (Tr. 8), but he was the only one included at the briefing for the second buy who was not present at the first buy. (Tr. 9) The same CI had successfully taken part in a previous unrelated drug buy conducted by Agent Stanfield. (Tr. 5, 57) Agent Stanfield assigned credibility to that informant. The second buy took place using the same CI. Preparations were made by searching the CI's vehicle and the person of the CI. This was followed by placing a digital transmitter on the informant. Agent Trowbridge listened to the conversation which took place between the CI and the drug seller, as related in the Factual Background, and based on his training and experience, Agent Trowbridge believed what was taking place was a drug transaction. The second buy was observed by Drug Task Force agents and after the Ford Focus left the site of the transaction, the CI informed Agent Stanfield that the seller had been alone and that the CI had exchanged the buy money for methamphetamine, which she(it became clear during the hearing that

the CI was a female) then gave to Agent Stanfield. During this buy, the CI did not see any additional quantities of methamphetamine as she had reported earlier in the day. This observation would tend to bolster her reliability and truthfulness, in that she was not trying to augment the amount of methamphetamine in sight for the officers' benefit.

After losing sight of the Ford Focus, the officers later found it parked approximately one-half mile from the location of the second buy at the residence of an associate of Lopez-Vargas, Joe Ben Baxter, who was suspected of being involved in the drug trade.

Although Agent Trowbridge was not directly involved in the first buy which the CI made on October 17, 2005, Agent Billy Joe Stanfield was directly involved. The buy was a controlled buy. The CI had told Agent Stanfield that the CI could purchase methamphetamine from the defendant. In preparations made for the controlled buy, the secretary of the Hayti, Missouri, Police Department did a thorough pre-purchase search of the informant and nothing illegal was found on the informant. Agent Stanfield provided the informant with $100.00 and a vehicle, which was also searched prior to the buy. The informant then drove the vehicle to a residence south of Caruthersville, where defendant, whom she knew as Julio, was residing. She was followed by Agents Stanfield, John Higgins and Agent Jamie Decker. After several phone calls were made to the defendant, the defendant pulled up in his vehicle, a black Ford Focus. The CI entered the Ford Focus with the defendant and the sale took place. As noted earlier, the CI noticed a large amount of methamphetamine which she estimated as at least two ounces. She told the officers that "Julio" used a set of digital scales to weigh the methamphetamine, packaged it and gave it to the CI. The drugs were later recovered from the CI by Bootheel Drug Task Force agents.

Before the second buy, there was a briefing, at which Agent Stanfield described what had happened during the first drug buy. Agent Trowbridge was present for the briefing. A physical

description of the seller and a description of the automobile which he was driving including its license plate were given to the agents at the briefing. (Tr. 68-70)

When the Ford Focus pulled away from the residence, it headed straight for where Agent Trowbridge was waiting in surveillance. It passed Agent Trowbridge going in the opposite direction. Agent Trowbridge turned his car around to approach the vehicle from the rear to make sure it was the black Ford Focus the officers were looking for and observed the license plate and identified it as the Ford Focus.

Officer Trowbridge observed the Ford Focus drive in the middle of the road, straddling the centerline.

After Agent Trowbridge observed the Focus cross the centerline, he activated his emergency lights. The Focus pulled over to the side of the road and stopped.

When Agent Trowbridge approached the car, as stated in the Factual Background, the defendant placed both of his hands outside of the driver's window and held them there as Agent Trowbridge approached his vehicle. This action on Mr. Lopez-Vargas's part indicated to Agent Trowbridge that Mr. Lopez-Vargas had been stopped by law enforcement in the past, possibly on a felony stop. (Tr. 17)

When the officers stopped the defendant's Ford Focus, they had more than reasonable suspicion that a crime had been committed. The Ford Focus had been involved in two controlled buys on the same day. Besides the drugs that were purchased, on the first buy a large amount of other drugs were observed by the CI as well as a digital scale, which the seller used to measure out the methamphetamine. Even if the officers had not had reasonable suspicion, they had probable cause to stop the vehicle after it was observed committing a traffic violation. Whren v. United States, 517 U.S. 806, 811-13 (1996); United States v. Barragan, 379 F.3d 524, 528 (8th Cir.

2004); <u>United States v. Williams</u>, 429 F.3d 767, 772 (8th Cir. 2005). The subjective intentions of police are irrelevant to an evaluation of the constitutionality of a detention under the Fourth Amendment. <u>Whren</u>, <u>id</u>.

The Ford Focus left the home of Joe Ben Baxter, a person with whom Mr. Lopez-Vargas was associated. This information was supplied by the confidential informant (Tr. 93), who, by this time, had participated in three successful controlled buys of illegal substances. The officers saw the headlights come out of the driveway of Ben Baxter's and a further check was made when Agent Trowbridge passed the Focus going in an opposite direction, turned around and proceeded to approach the Focus from the rear to check the license plate, which he did. The officers, who had participated collectively in two controlled buys involving that vehicle and its driver earlier in the late afternoon and evening of that day, possessed specific articulable facts which created a reasonable suspicion that the driver had committed crimes. It is the collective knowledge of all the officers involved which determines the sufficiency of that knowledge. <u>United States v. Wilson</u>, 964 F.2d 807, 809 (8th Cir. 1992); <u>United States v. Wajda</u>, 810 F.2d 754, 758 (8th Cir. <u>cert.</u> <u>denied</u> 1987) quoting <u>Beck v. Ohio</u>, 379 U.S. 89, 91, 85 S.Ct. 223, 225 (1964).

The court finds that there was more than enough legal justification for an investigatory detention of the Ford Focus and its driver and that the stop was not illegal.

## **Consent to Search**

The defendant claims that any consent to search given by him was not voluntary and knowingly and understandingly given because he does not clearly and articulately understand the English language. Further, the defendant urges the consent was coerced because the defendant was surrounded by six men who were armed. As a result, the defendant could reasonably have

believed he was not free to leave. These claims by the defendant are not supported by the facts. In an investigatory detention, as in all stops, there is some interference with a detainee's freedom, but, as here, it is brief and justified by the circumstances.

The evidence is replete with testimony that the defendant understood English and spoke English fluently. The fact that the defendant asked for an interpreter after he came into court does not mean that he did not understand what he was doing when he consented to the search of the black Ford Focus. An examination of the question of the defendant's understanding of English and of the voluntariness of his consent to search requires an extensive review of the instances when he engaged in conversation.

After the second buy, when the Ford Focus was stopped by Agent Trowbridge, Trowbridge engaged the driver in conversation and it was conducted in English. Mr. Lopez-Vargas did not indicate to Agent Trowbridge that he did not speak English. (Tr. 18-19) His English appeared understandable to Agent Trowbridge. When asked if the defendant appeared to understand what Agent Trowbridge was telling him, Trowbridge replied, "Oh, yes, sir. Mr. Vargas was very polite, cooperative, the entire time I had contact with him." The agent asked Mr. Vargas to step out of the vehicle and Mr. Vargas did so.

Officer Trowbridge asked the defendant if he had any weapons or any controlled substances inside the vehicle. Mr. Lopez-Vargas stated, no, he did not. Agent Trowbridge then asked if Mr. Lopez-Vargas "cared if I looked for weapons or controlled substances" and he said, "Yes, go ahead and search," and even opened his hands. Shortly after that, Agents Stanfield and Fowler pulled in behind Trowbridge's car and Trowbridge conveyed to Fowler and Stanfield that the defendant had given consent to search his car. At this point, the defendant had not been arrested; he had not been frisked or patted down for weapons; nor had he been handcuffed; he had

not been restrained in any way; nor had Trowbridge threatened Mr. Lopez-Vargas. Trowbridge did not hear anyone else threaten Mr. Lopez-Vargas. Trowbridge's weapon was concealed. The other officers had not drawn their weapons. No promises were made nor were representations made to Mr. Lopez-Vargas in order to obtain his consent. Agents Fowler and Stanfield conducted the search as Agent Trowbridge stayed with Mr. Lopez-Vargas.

At no time after the consent was given did Mr. Lopez-Vargas protest about the search or revoke his consent. Trowbridge testified that he and Mr. Lopez-Vargas continued in polite conversation. Trowbridge stated that Mr. Lopez-Vargas was very cooperative and very polite to him. It was then that Agent Fowler found digital scales in the glove compartment and behind the glove compartment, the officer located a small firearm and a green canvas bag that contained methamphetamine and cash wrapped in duct tape. Mr. Lopez-Vargas was then arrested, and Agent Stanfield placed handcuffs on the defendant.

After the methamphetamine was found, Agent Stanfield came back and read Mr. Lopez-Vargas his rights. Stanfield asked Lopez-Vargas if he understood those rights and Mr. Lopez-Vargas said he understood his rights. This took place in English. Mr. Lopez-Vargas did not appear to have any kind of problem understanding what was going on. Trowbridge testified that he understood everything that Mr. Lopez-Vargas said. While the search was taking place, Trowbridge and Lopez-Vargas engaged in "chit chat." Trowbridge testified that he had no difficulty communicating with Lopez-Vargas at that time.

While pictures were being taken, Trowbridge asked the defendant about the methamphetamine. The defendant said that the methamphetamine was not his, that it belonged to a friend who lives in Memphis.

After the defendant was brought to the Pemiscot County Jail, he was interviewed by Agents Stanfield and Fowler.

On cross-examination, Agent Trowbridge was asked whether Mr. Lopez-Vargas answered his questions in single word responses. Agent Trowbridge said that when he asked Mr. Lopez-Vargas if he had any weapons or controlled substances inside the vehicle, Mr. Lopez-Vargas responded, "No, I do not." Asked then if he would care if the officers were to search the vehicle for weapons or controlled substances, Mr. Lopez-Vargas responded, "Yes, go ahead" and the defendant "made a body motion as to open up and show me his vehicle."

Agent Trowbridge was asked whether the Pemiscot County Sheriff's Office maintains <u>Miranda</u> warning forms in Spanish. Agent Trowbridge stated that the forms that he had do not have any kind of Spanish on them but "... during the original investigation there was no even thought or concern, he seemed to understand every English question we had." (Tr. 55)

On redirect examination, Agent Trowbridge stated that Mr. Lopez-Vargas did not ever ask for an interpreter, nor did he ever complain that he could not understand what was being said.

The telephone conversation between the CI and the defendant prior to the second buy indicates a good grasp of colloquial English. For instance, Mr. Lopez-Vargas is reported to have told the informant "If you need anything else, make sure you holler at me." (Tr. 58)

Agent Stanfield's description of his administering the <u>Miranda</u> rights to the defendant is instructive. Agent Stanfield actually read the <u>Miranda</u> warnings to the defendant twice.

The first time Agent Stanfield provided the <u>Miranda</u> rights to the defendant, he read them from a card. He then asked the defendant if the defendant understood the rights he had read and the defendant replied yes. Stanfield testified that he read everything on the <u>Miranda</u> card.

At the jail after the defendant had been booked, Agent Stanfield spoke to the defendant again in an office in the Pemiscot County Sheriff's Department. The office contained a regular desk, a computer and two or three chairs. The defendant was not handcuffed. Agent Stanfield described his second rendering of the <u>Miranda</u> rights in the following words:

> A    We've got a form, I read him his rights off the form. I asked him if he understood his rights, he said yes. Then I asked him – I asked him if he could read and he said yes, he could read and I gave him the form. I said read it, put your names by each number, sign your name, then I witnessed it, Matt Fowler witnessed it and it was signed.
>
> Q    Okay. Did he indicate he understood his rights on this second reading?
>
> A    Yes, sir, he said he understood his rights.

(Tr. 78-79) Agent Stanfield testified that Mr. Lopez-Vargas did not ask any questions about his rights. He did not ask for an interpreter or an attorney. Through the course of the interview, Lopez-Vargas did not ever ask for an interpreter or an attorney.

Mr. Lopez-Vargas signed below the written statement of his rights. Following the defendant's signature is a paragraph stating that the defendant had read the rights and he agreed to give up any rights and talk to the police. He signed below that statement. (Tr. 79)

According to Agent Stanfield, following the administration of the <u>Miranda</u> warnings, the defendant made the following statement, as summarized by Stanfield, about the methamphetamine found in the car:

> He stated to us that he knew something was in the car and he stated there was more people involved and he said that the – the drugs that was found on him he used. He said he sold drugs to make money and he also said he wanted to cooperate. He said if you all can get me out of jail now I can get you all, you know, set the world on fire for you basically and I explained to him, I said I can't just get you out of jail right now to do that which we'd already talked to I think Agent Trowbridge and talked to DEA agent and he said he would be down tomorrow, and which I told him. I said we want to come back tomorrow and speak to you.

(Tr. 81) Before the waiver was signed, Stanfield did not make any promises to the defendant nor representations as to what was going to happen to the defendant, nor did he make any threats to the defendant. Stanfield did not hear anyone else threaten the defendant. The conversation between the defendant and Stanfield was all in English. Stanfield did not have any difficulty in understanding Mr. Lopez-Vargas. Mr. Lopez-Vargas did not seem to have any difficulty understanding Stanfield. (Tr. 81-82)

On cross-examination, when he was asked whether he had asked the defendant whether he could speak and converse in English, Agent Stanfield replied that he had not, that he did not feel that he needed to ask Lopez-Vargas because he could speak English. The agent stated that Lopez-Vargas understood him and he understood Lopez-Vargas. When asked how he knew, Stanfield replied that Lopez-Vargas answered his questions in multi-word answers.

Agent Stanfield stated that while the car was being searched, Stanfield did not see Mr. Lopez-Vargas object or protest or attempt to revoke his consent. He did not ever complain later that he had not told the officers they could search the car. (Tr. 106-107)

Special Agent Bernie Gard of the Drug Enforcement Administration interviewed the defendant on October 18, 2005, at the Pemiscot County Jail. The interview took place in a conference room which Agent Gard described as having a long table, five or six chairs on each side of the table, a telephone, possibly a bulletin board, several computers, a sink and microwave.

When the defendant was brought into the room, Agent Gard removed handcuffs and asked Mr. Lopez-Vargas if he wanted to talk with the agent. Agent Gard identified himself and told the defendant that he was with the Drug Enforcement Administration and that he was curious about the reason why the defendant was incarcerated. Agent Gard testified that before he even sat down, the defendant immediately said, "Let's make a deal." The agent responded that before he could

ask the defendant any questions, he wanted to read the defendant his <u>Miranda</u> rights. Gard testified that he was sitting next to the defendant with a Pemiscot County Sheriff's Department <u>Miranda</u> form and Gard pointed to the sentences as he read them. After each sentence, the agent asked the defendant if he understood that right. The defendant responded yes. After each sentence, Gard would rephrase it. For instance, after the statement that "You have the right to remain silent" Agent Gard asked if he understood that and the defendant responded, "Yes." Then Agent Gard rephrased it in the following way: "You don't have to talk to me, you don't have to say anything if you don't want to. Do you understand?" And the defendant said, "Yes." (Tr. 115) In covering the five points of the <u>Miranda</u> warnings, Agent Gard testified that he did that for each and every sentence. Before Agent Gard read the form to the defendant, he asked the defendant if the defendant understood English and could the defendant read English and the defendant responded yes, that he could understand and he could read English.

After they had gone through each of the rights, the defendant agreed to sign the waiver of rights form. Agent Gard said he read the entire form to him and showed him the form. When the defendant said he wanted to speak with Agent Gard and wished to waive his rights, Gard showed the defendant where to sign. The defendant appeared to look it over and pause for a moment before he signed it. He used the agent's pen to sign the form and he agreed to speak with Agent Gard.

Agent Gard testified that after the defendant signed the form, "... the next thing out of his mouth was 'What can you do for me? How do I get out of this situation?'" (Tr. 114-116)

Agent Gard testified that the defendant spoke in English. At no time during the conversation did he lapse into Spanish. He did not ask for an interpreter or an attorney. He did not ever tell Agent Gard that he wished to stop the questioning. Agent Gard testified that when he

was reading the waiver and reached the fifth statement that Mr. Lopez-Vargas could decide at any time to exercise the rights and not answer any questions or make any statements, he rephrased the warning and told the defendant "... that if we get to a certain point and you decide you do not want to talk to me at all, just tell me and I'll stop and I'll leave."  (Tr. 117)

Agent Gard testified that he did not make any threats to Mr. Lopez-Vargas nor any promises nor any representations.

Among the statements the defendant made to Agent Gard was a description of the sale of methamphetamine to a female, the fact that he had been stopped by the police shortly thereafter and the police had found a quantity of methamphetamine in the car, as well as cash.  Agent Gard testified that Mr. Lopez-Vargas did not complain about mistreatment at the hands of the police or complain about the search of the car or that he did not tell them they could search the car.  He did not indicate that he had been threatened or coerced by the officers.

Mr. Lopez-Vargas went on to discuss in detail that he was hired by an old school friend out of Mexico and was paid $500.00 a week to translate drug transactions in Southeast Missouri because he could speak English and Spanish.  He was paid $500.00 a week to conduct transactions with persons who did not speak Spanish.  (Tr. 118-119) The defendant told Agent Gard that he was from Mexico and that he'd been in the United States illegally for quite some time.

Agent Gard testified that he went to see Mr. Lopez-Vargas because Mr. Lopez-Vargas indicated he wanted to talk to authorities.  Gard was with the defendant for four hours, but it was not four hours of continuous talk.  They took breaks.  Gard and Lopez-Vargas were trying to work something out so that the defendant could help himself out.  Agent Gard expressed the opinion that Mr. Lopez-Vargas "could put together pretty good sentences" when asked if the defendant answered questions in complete sentences or just one or two words.  Mr. Lopez-Vargas

was allowed to make several telephone calls for the purpose of helping himself out. The defendant was advised that anything he was able to do in the war against drugs would be brought to the attention of the U. S. Attorney. The agreement to bring to the attention of the U. S. Attorney the defendant's efforts to help in the war against drugs was made long after the defendant had waived his right to remain silent. (Tr. 124)

The defendant testified that he did not consent to a search of the vehicle he was driving on October 17, 2005. He stated he had been in the United States for five years. He had gone as far as the sixth grade in Mexico and spoke very little English. (Tr. 126-127) The defendant did not deny that he participated in all of the interviews and conversations included in this report and recommendation.

Task Force Agent Jamie Decker was called as a rebuttal witness. He testified that when asked by Agent Trowbridge if he could search the vehicle for controlled substances or firearms, Lopez-Vargas "said that would be fine." Agent Decker testified that he was around Mr. Lopez-Vargas at other times during the investigation and heard the defendant speaking English fluently in full sentences. He also appeared to respond properly when English was spoken to him.

Considering all the foregoing evidence, the court finds that the defendant, Jorge Lopez-Vargas, understands English and speaks English fluently. The court further finds that the defendant voluntarily, knowingly and understandingly gave his consent to search the Ford Focus on October 17, 2005. The contraband found within the automobile, including the digital scales, the heroin, the money and the pistol, were all properly seized as evidence of crime following the valid consent to search by the defendant. Schneckloth v. Bustamonte, 412 U.S. 218, 219; United States v. Bradley, 234 F.3d 363, 366-67 (8th Cir. 2001). The items found on the defendant, including methamphetamine and additional money, was properly seized as incident to the

defendant's appropriate arrest which followed the discovery of the drugs and other contraband in the Ford Focus. New York v. Belton, 453 U.S. 454, 461 (1981); United States v. Pratt, 355 F.3d 1119, 1124 (8th Cir. 2004).

The defendant further made comment that his consent was coerced because he was surrounded by six men who were armed.

There was no indication that any arms were drawn. Agent Trowbridge's firearm was not visible. The statement that the defendant was surrounded by six men is not in accord with the facts. When the defendant was asked to give his consent to the search of his vehicle, he and Agent Trowbridge were located between the back of the Ford Focus and the front of Trowbridge's vehicle. Agent Jamie Decker was on the passenger side of Trowbridge's vehicle in the front and Agent John Higgins was on the passenger side of Trowbridge's vehicle near the back door. (Tr. 20) When Trowbridge, Higgins and Decker stopped the Ford Focus, "Stanfield and Fowler were in a separate vehicle on the other side of Highway 164." When Stanfield and Fowler arrived, Agent Trowbridge told them that he had just received consent to search the car. (Tr. 103) Once the drugs and guns were found, there were a couple of uniformed deputies that had arrived and Stanfield asked them to put Mr. Lopez-Vargas in handcuffs. The uniformed officers took him for transport.

At the time consent was given, there were not six officers surrounding the defendant. He was talking to Agent Trowbridge who had placed him between the two cars to get him out of the roadway. (Tr. 19) Agents Decker and Higgins were on the passenger side of Trowbridge's vehicle, Decker in the front and Higgins near the back door. As noted above, when the Ford Focus was stopped, Stanfield and Fowler were in a separate vehicle on the other side of Highway 164. When Stanfield and Fowler arrived at the Ford Focus, consent had already been given to

search the car. It was after the drugs were found that the two deputies arrived. It is clear that when he consented to the search of the car, Mr. Lopez-Vargas was not surrounded by six officers.

Considering the totality of circumstances presented in the evidence and the painstaking and repeated administration of the Miranda warnings to the defendant, the court finds the defendant's waiver of his Miranda rights was voluntary, knowing and intelligent. His statements to the officers on October 17th and 18th, 2005, are admissible at trial. Miranda v. Arizona, 384 U.S. 436, 475 (1966).

The court has found that there was more than enough legal justification for an investigatory detention of the Ford Focus and its driver and that the stop was not illegal.

The court further finds that the defendant, Jorge Lopez-Vargas, understands English and speaks English fluently. The court further finds that the defendant voluntarily, knowingly and understandingly gave his consent to search the Ford Focus on October 17, 2005. The contraband found within the automobile, including the digital scales, the heroin, the money and the pistol, were all properly seized as evidence of crime following the valid consent to search by the defendant. The items found on the defendant, including methamphetamine and additional money, was properly seized as incident to the defendant's appropriate arrest which followed the discovery of the drugs and other contraband in the Ford Focus.

The court further finds that when he consented to the search of the car, Mr. Lopez-Vargas was not surrounded by six officers.

Statements made by the defendant to the various officers as related in the testimony followed the administration of the Miranda warnings, the defendant's acknowledgment that he understood those warnings and the defendant's voluntary, knowing and intelligent waiver of the various rights contained in those warnings. As a consequence, the court finds that the defendant's

statements were voluntary and consensual and not the result of the defendant's will having been overborne.  Haynes v. Washington, 373 U.S. 503, 513-14 (1963).

**IT IS, THEREFORE, RECOMMENDED** that the Motion to Suppress Evidence and Statements of Jorge Lopez-Vargas be denied.


The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated:  January 18, 2006.